[No. 10,515.—In Bank.]

## EX PARTE KEARNY.

HABEAS CORPUS—POLICE COURT OF SAN FRANCISCO—INFERIOR COURT—JURISDICTION—CASE CRITICISED.—The Police Court of the City and County of San Francisco is an *inferior court* of limited jurisdiction, whose powers are conferred, and whose duties and modes of procedure are prescribed, by statute, and to which the rule applies that the evidence of its proceedings must affirmatively show jurisdiction of the person of a defendant, and over the subject-matter; and the remark to the contrary, in *Ex parte Murray*, 45 Cal. 455, is *dictum*.

ID.—ID.—ID.—ID.—Where it affirmatively appears from the record of the proceedings of an *inferior court* that a person was tried and sentenced to be punished for an act which is not a crime, the judgment is absolutely void, and a person in custody under such a judgment will be discharged on *habeas corpus.*

CASES DISTINGUISHED —*Ex parte Watkins*, 3 Peters, 193 ; 5 Cranch, 173.

ID.—CONSTRUCTION OF ORDINANCE.—To constitute an offense under subd. 3, § 28, of Order No. 697, as amended by Order No. 1,196 of the City and County of San Francisco—which provides that "No person shall address to another, or utter in the presence of another, any words * * having a tendency to create a breach of the peace"—the words must be uttered in the presence of the person whom they tend to provoke to such breach of the peace.

ID.—ID.—POLICE COURT OF SAN FRANCISCO—INFERIOR COURT—JURISDICTION.— The petitioner was in custody under a judgment of the Police Court of San Francisco, condemning him to six months' imprisonment and the payment of $1,000; and the offense charged in the complaint was, that the petitioner "did willfully and unlawfully utter and address to others, to wit, to a large number of persons then and there assembled * * * certain profane words and language, which words and language then and there had a tendency to create a breach of the peace." But there was no averment that the words were " addressed to, or uttered in the presence of," the person of whom they were spoken. *Held*, that the complaint charged no offense, and that the petitioner was entitled to his discharge.

ID.—ID.—ID.—ID.—ID.— A court, (whether superior or inferior) derives its jurisdiction from the law, and its criminal jurisdiction extends only to such matters as the law declares to be criminal; and, when it undertakes to imprison for an offense to which no criminality is attached, it acts beyond its jurisdiction, and the party imprisoned is entitled to his discharge on *habeas corpus.*—THORNTON, J.

APPLICATION of Denis Kearny for writ of *habeas corpus.*

The facts are stated in the opinion.

*Clitus Barbour*, for Petitioner.

The complaint charges no crime. This Court may look into it to determine the question. (22 Cal. 179 ; 52 id. 606 ; 32 Ala. 583 ; 60 N. Y. 565 ; 18 Wall. 163.) An ordinance must be

reasonable.    (*Ex parte Frank*, 52 Cal. 606 ; Dillon Mun. Corp. § 253.)

The jurisdiction of the Police Court must appear affirmatively on the face of the proceedings, and in the complaint.

*Delos Lake*, for Respondent.

It is well settled that it is not a proper function of the writ of *habeas corpus* to review, as on a writ of error, or on appeal, the judgment or determination of any court or judge, civil, military, or ecclesiastic, in any matter of which such court or judge has jurisdiction.    When it appears from the return of the officer, having custody of the prisoner, that he is detained by virtue of any process issued upon the judgment of any court having jurisdiction, that is the end of the matter, and the prisoner must be remanded.    Jurisdiction is the power to hear and determine, and implies the power to determine erroneously as well as correctly.    If, therefore, the Police Court had jurisdiction over the offense charged—that is, over the offense of misdemeanor—then it had the power to hear and determine the case ; and its decision is final and conclusive.    The statute (2 Hitt. Codes, art. xiv, 473) provides, that " every person *unlawfully* imprisoned " may prosecute the writ.    An imprisonment by virtue of an execution issued upon a judgment rendered by a court having jurisdiction, is not unlawful.    Section 1486 of the Penal Code requires the Court to remand the prisoner, if it appears that he is detained " by virtue of the final judgment or decree of any competent court of criminal jurisdiction, or of any process issued upon such judgment or decree."    Section 1487 provides the cases in which the court or judge may discharge, where " it appears on the return of the writ that the prisoner is in custody by virtue of process from any court of this State, or judge, or officer thereof"; none of which cover the present case. The following authorities sustain the above propositions. (*People* v. *Mayer*, 16 Barb. 362 ; *People* v. *Cavanagh*, 2 Parker Cr. C. 650 ; *People* v. *McCormick*, 4 id. 9 ; *Case of Prime et al.* 1 Barb. 340 ; *Ex parte Watkins*, 3 Pet. 193 ; *Ex parte Parks*, 93 U. S. 18 ; *In re Truman*, 4 Mo. 181 ; *In re Harris*, 47 id. 164 ; *In re Callicot*, 8 Blatchf. 89 ; *In re Eaton*, 27 Mich.

1; *Crandall's Case*, 34 Wis. 177; *Senler's Case*, 41 id. 517; *Tweed's Case*, 60 N. Y. 559; *Platt* v. *Harrison*, 6 Iowa, 79; *Ex parte Murray*, 45 Cal. 455; *Ex parte Hartman*, 44 id. 32; *Ex parte McCullough*, 35 id. 97; *Ex parte Riley*, 2 Pick. 172; *People* v. *Shea*, 3 Parker Cr. C. 562; *Ex parte Ezell*, 40 Tex. 451; *Ex parte Fisher*, 6 Neb. 309.)

*D. J. Murphy*, also for Respondent.

The Police Court had jurisdiction both over the person of the petitioner and the subject-matter; and though its judgment may be erroneous, it cannot be void. (*Ex parte Winston*, 9 Nev. 71; *Platt* v. *Harrison*, 6 Iowa, 79; 1 Kent, 647; *Com.* v. *Lecky*, 1 Watts. 67; *Ex parte Kearney*, 7 Wheat. 38; *In re Harris*, 47 Mo. 164; *Ex parte Kellogg*, 6 Vt. 509; *Gray's Case*, 11 Abb. Pr. 56; *In re Eaton*, 27 Mich. 1; *Johnson* v. *U. S.* 3 McLean, 89; *Tweed* v. *Liscomb*, 60 N. Y. 559; *Dyckman* v. *Mayor etc.* 1 Seld. 440; *Fisher* v. *Bassett*, 9 Leigh, 131; *Cox* v. *Thomas*, 9 Gratt. 326; *Hunt* v. *Hunt*, 72 N. Y. 217, (229); *Ex parte Murray*, 45 Cal. 455.) This Court has, in numerous cases, held that the writ of *habeas corpus* cannot be converted into or used as a writ of error or review. (*Ex parte Bird*, 19 Cal. 130; *Ex parte McCullough*, 45 id. 99; *Ex parte Max*, 44 id. 579; *Ex parte Hartman*, id. 32.)

McKinstry, J.:

The Police Court of the City and County of San Francisco is an "inferior court" of limited jurisdiction, whose powers are conferred, and whose duties and mode of procedure are prescribed, by statute, and to which the rule applies that the evidence of its proceedings must affirmatively show jurisdiction of the person of the defendant, and over the subject-matter. The remark to the contrary in *Ex parte Murray*, 45 Cal. 455, is *dictum*. The only question there was, whether the judgment should have shown on its face the particular offense of which the petitioner had been found guilty? There is frequently a difficulty in ascertaining whether a particular court is or is not "inferior" within the meaning of that term as used in the books. In England, probably all courts, except the King's

at Westminster, the King's Bench, Court of Bankruptcy, Exchequer, and Chancery, are treated as inferior courts. (Cowen and Hill's Notes Phillips' Ev., 4th American ed., vol. 2, p. 105.)

It is clear that courts invested with a general common-law jurisdiction in law or in equity are, when exercising their general jurisdiction, superior courts, within the meaning of the rule which accords every presumption in favor of the validity of their judgments. In the United States, however, it has frequently been held that a court may be limited and subordinate in its jurisdiction, and yet not be an inferior court "in the sense that it ought to certify everything precisely." (1 Saund. 74.) And this will explain some of the cases cited by counsel. In several of those cases, it was, in effect, determined that a court holding jurisdiction of all criminal cases should be protected, though it adjudge a matter to be criminal which is not so, and proceed to punish it. (*Ex parte Tobias Watkins*, 3 Peters, 193 ; 5 Cranch, 173.) The Circuit Court of the United States for the District of Columbia having been determined to be a superior court, with jurisdiction over all crimes, the application of the rule was not difficult, and accordingly it was held, in *Ex parte Watkins*, that the judgment of that Court " was evidence of its own legality, requiring no inspection of the indictment on which it was founded"; and the Supreme Court refused to look at the indictment.

We do not forget that the only difference, ordinarily recognized between superior and inferior courts, is that there is a presumption in favor of the validity of the judgments of the former, none in favor of those of the latter, and that a superior court may be shown not to have had power to render a particular judgment by reference to its record. We only say that, in *Ex parte Watkins*, the Supreme Court of the United States refused to look at the indictment, because the Circuit Court was to be treated as a superior court, with jurisdiction of all crimes.

In other cases, it has been held broadly by the Supreme Court of the United States, that the District as well as the Circuit Courts of the United States are not inferior courts. (Hurd on Habeas Corpus, 365.) It is apparent that decisions, with reference to the conclusive presumptions arising from the

judgments of those courts, can have no influence upon the question, whether the Police Court shall be conclusively presumed to have jurisdiction to render every judgment which it may render, unless the latter, like the former, is a " superior " court. In *Ex parte Murray*, 45 Cal., it was said : " The judgment is one thing—the brief statement (in the minutes) of the offense of which the prisoner has been convicted is a different thing. The former—the *ideo consideratum est*—need contain no recital ; it is here, simply, ' that the said Patrick Murray pay a fine of forty dollars,' " etc. Every recital in a judgment, therefore, as to the offense, is surplusage, and if the claim of counsel is well founded, the judgment of the Police Court, that a defendant be imprisoned, determines the power of the Police Court to imprison him. If, however, the Police Court is an inferior court, (whatever the rule as to the superior courts) everything should appear in its proceedings necessary to give it jurisdiction and to justify its judgment. (*Kempe's Lessee* v. *Kennedy*, 5 Cranch, 174.)

There is no certain test by which to determine in all cases to which class, (superior or inferior) any given court belongs. (Hurd on Habeas Corpus, 364.) It is not remarkable, therefore, that there has been some diversity in the application of the rule, as to the presumptions, to particular courts. In New York, the " Surrogate Court " is held to be " inferior," but in Pennsylvania, Maryland, and Alabama, the " Orphan's Court," and in Arkansas the " Probate Court," are held to be " superior." In New York the General Sessions of the Peace in the several counties are held to be " inferior," while in Pennsylvania, Vermont, and Connecticut, a Justice's Court is under the rule said to be " superior." The question seems to have resolved itself into one of public policy, and whether the particular court of the limited jurisdiction ought to have extended to its judgment the sanctity of the presumptions arising from the adjudications of tribunals of general common-law jurisdiction. That the underlying and controlling principle upon which the question must be decided is simply a consideration of correct public policy, is indicated by the language employed by the Supreme Court of Vermont in *Wright* v. *Hazen*, 24 Vt. 143. The Court there says : " We are aware that the decisions in New York, and probably

in some other States, have required the justice to know the facts limiting his jurisdiction at his peril. But no such rule has ever been applied to the courts of general jurisdiction, either in Westminster Hall, or in this country; and the jurisdiction of justices of the peace has become so important and extensive, that we incline to believe sound policy requires of us to extend the same rule of construction in favor of their jurisdiction which is done in favor of courts of general jurisdiction." (Hurd on Habeas Corpus, 366.)

This Court has never extended the rule as to presumptions in favor of the judgments of courts of general jurisdiction, to courts of justices of the peace in California. On the contrary, such courts, in this State, have uniformly been treated as "inferior courts, in favor of whose jurisdiction nothing could be assumed. (12 Cal. 283; 23 id. 401; 33 id. 318; 34 id. 321.) And prior to the adoption of the amendments of 1862 to the Constitution of 1849, and the Act of April 20th, 1863, the Probate Courts in California were always considered as of inferior and limited jurisdiction, to whose "records, orders, judgments, and decrees" were accorded none of the legal presumptions given to those of District Courts in the exercise of their more general jurisdiction. (*Pryor* v. *Downey*, 50 Cal. 388.) So far, then, as analogous decisions of this Court have gone, it would seem that the Police Court should be treated as an inferior court. It would be strange if, while holding the judgments of justices of the peace, in criminal cases, not to carry with them the presumptions accorded the judgments of superior courts, we should determine that those of the Police Court, exercising a jurisdiction, in so far as legislative enactments are concerned, substantially the same, are to be treated as if rendered by a court of general jurisdiction. There are reasons peculiarly applicable to municipal courts which would render it proper that they should be held to be inferior courts. The primary design of municipal courts, so far as they act under city by-laws, is to prevent disorder in matters of local convenience, to regulate public and *quasi*-public easements, etc. As was said by Campbell, J., in *Jackson* v. *People*, 9th Mich. 111: "The Constitution, in apportioning the judicial power, as well as affirming the immunity of life, liberty, and property, has always

been understood to guarantee to each citizen the right to have his title to property, and other legal privileges, determined by the general tribunals of the State." There the judgment of the Recorder's Court, on a complaint for violating a city ordinance, was revised on *certiorari*. And it has been repeatedly held that this may be done, even where, by statute, it is declared that the proceedings of a municipal tribunal " shall be final and conclusive," or " without appeal." (Dillon on Munic. Corp. § 368.)

It is not necessary to say that *habeas corpus* may be resorted to whenever *certiorari* may be, but the jurisdiction employed by the superior courts, by means of *certiorari*, strongly indicates the jealousy entertained of possible excess of authority on the part of municipal tribunals administering by-laws or " prudential regulations " not extending beyond the limits of the municipality. The Constitution does not require the Legislature to provide for an appeal from the judgments of the Police Court to the Superior Court, and it would seem that every consideration of sound policy requires of us to treat the former court as an inferior tribunal, the record of whose proceedings should affirmatively establish its power to pronounce a particular judgment.

The Charter of San Francisco (Consolidation Act, Stat. 1861, p. 552) provides:

" Section 74. The Board of Supervisors shall have further power by order or regulation.   *   *   Eleventh—To determine the fines, forfeitures, and penalties, that shall be incurred for the breach of the regulations established by said Board of Supervisors, and also for a violation of the provisions of this act when no penalty is affixed thereto or provided by law. But no penalty to be imposed shall exceed the amount or value of $1,000, or six months' imprisonment, or both.   *   *   (Chap. 5.)

" The Board of Supervisors of the City and County of San Francisco shall have power by regulations or order   *   *   *   Third—To prohibit and suppress, or exclude from certain limits, all houses of ill-fame;   *   *   to prohibit and suppress, or exclude from certain limits, or to regulate, all occupations,   *   *   exhibitions, and *practices*, which are against good morals, contrary to public order and decency, or dangerous to the public safety." (Stat. 1863, § 1, subd. 3, p. 543.)

The Board of Supervisors passed Order No. 697 as amended by Order No. 1,196.   Chap. 3, § 1, of said·order provides :

" Any persons violating any of the provisions of this chapter shall be deemed guilty of a misdemeanor, and be punished by a fine of not exceeding $1,000, or imprisonment not to exceed six months, or by both such fine and imprisonment."

And § 28 of said chap. 3 provides:    *    *    " No person shall * * 2. Utter in the hearing of two or more persons any bawdy, lewd, obscene, or profane language, words, or epithets.    3. Address to another, or utter in the presence of another, any words, language, or expression, having a tendency to create a breach of the peace."

We shall assume for the purposes of this decision—without admitting the law so to be—first, that we ought not to inquire on *habeas corpus*, with a view to petitioner's discharge, whether the sections of the charter above cited authorized the Board of Supervisors to adopt the Orders 697 and 1,196 ; second, that we ought not to inquire, except for a limited purpose, whether the ordinance is " reasonable," and one which a municipal government may enforce ; third, that we cannot inquire on *habeas corpus* whether the Orders 697 and 1,196 were properly published prior to their passage, inasmuch as they are verified by the signatures of the Mayor and Clerk of the Board.

It is not to be presumed that a court of general jurisdiction —or one which the law treats as such—has, in any case, proceeded to adjudge upon matters over which it had no authority. On the other hand, no such intendment is made in favor of the judgment of a court of limited jurisdiction—an " inferior court " —but the recitals contained in the minutes of the proceedings must be sufficient to show that the case was one " which the law permitted the court to take cognizance of, and that the parties were subjected to its jurisdiction by proper process." (Cases cited in note 1, p. 407, Cooley's Const. Lim.)   If indeed the proceedings show that an inferior court has found the existence of a fact on which the right to proceed depends, and, by the constitution of the court, the existence of the fact is a matter placed within the jurisdiction of the court for determination, the adjudication of the inferior court that the facts exist is conclusive.   As stated by Mr. Justice Cooley—after he has laid

down the proposition that in case of a court of special and limited authority it is permitted to show a want of jurisdiction even in opposition to the recitals contained in the record: "This we conceive to be the general rule, though there are apparent exceptions of those cases where the jurisdiction may be said to depend upon the existence of a certain state of facts which must be passed upon by the courts themselves, and in respect to which the decision of the court, once rendered, if there was any evidence whatever on which to base it, must be held final and conclusive in all collateral inquiries, notwithstanding it may have erred in its conclusions." (Const. Lim. 407.)

We have assumed that the existence of the ordinances which, as claimed, gave the Police Court the appropriate jurisdiction, and the publication thereof—supposing the publication to be inquirable into by any court—were matters to be ascertained by the Police Court, and that, on *habeas corpus*, we ought not to go behind the finding of the Police Court with respect to such matters. We also assume that the orders or ordinances referred to were proven. We are not called on, therefore, to re-examine the evidence with respect to any fact passed upon by the Police Court.

The records of the Court show that two complaints were made against the petitioner. The first charged him with having uttered, in the hearing of others, bawdy, obscene, and profane language. That charge was dismissed.

As we have seen, nothing is to be presumed, in the first instance, in favor of the judgment of the Police Court. If the record does not show, upon its face, the facts necessary to give the Court jurisdiction, they will be presumed not to have existed. But this presumption (except in California, as to such jurisdictional matters as the law requires to be reduced to writing) may be rebutted, and the jurisdictional facts established by extrinsic evidence. (Hurd on Habeas Corpus, 367.) We have assumed that the fact of the existence of the ordinances which, as was supposed, gave the Police Court jurisdiction, must be presumed to have been established to the satisfaction of that Court, and, for the purposes of this case, the presumption will be held to be conclusive. But the Police Court could not give itself jurisdiction by its construction of an ordinance, when the very question

is, whether the inferior tribunal was given power by the ordinance to try petitioner on the charge on which he was actually tried. It devolved, therefore, upon those whose function it was to sustain the jurisdiction, to produce the ordinances which were proved in the Police Court, in order that it could be ascercertained whether they made the act, for which petitioner was tried, a crime, for the punishment of which the inferior court had power to impose the judgment which was rendered. We take judicial notice that the act charged in the complaint constitutes no crime under the general laws of the State. If the judgment of the Police Court is supposed to derive its validity from a city ordinance, we may assume an ordinance to have been proven, and it would be enough to show, perhaps, that it was admitted as proven by the Police Court. But whether the ordinance gave the Police Court power to punish petitioner for the offense charged in the complaint, is a question of law which we cannot avoid the responsibility of determining. Can it be doubted that if, on proof of an ordinance prohibiting certain unlawful assemblies, the Police Court should proceed to try a defendant, charged with doing some act not prohibited, and to render a judgment, imposing the penalty prescribed for taking part in such unlawful assemblies, the judgment would be void? The complaint would charge no crime known to the law of the land, and the same rule must apply, whether the law conferring jurisdiction on the inferior tribunal is to be looked for in the statutes of the State, or in orders of the Board of Supervisors of San Francisco.

Inasmuch as no presumptions are to be indulged in favor of the judgments of inferior courts, and as this Court will take judicial notice that the facts set forth in the complaint constitute no crime under the general laws of the State, the record of the proceedings in the Police Court should manifest that the petitioner was there prosecuted for an alleged violation of some city ordinance. Either the complaint sufficiently refers to, and so makes part of itself, Orders 697 and 1,196, or it does not. If it does not, there is nothing in the proceedings of the Police Court which show that the petitioner was tried for any offense of which that Court has jurisdiction. We shall assume, however, (as against petitioner) that Orders 697 and 1,196 suffi-

ciently appear from the record, and further, because alleged in the complaint in the Police Court, that they are now properly before us.

As we have seen already, the charge of uttering obscene and profane language was dismissed; it only remains to inquire whether the other complaint charged the crime created by the third subdivision of § 28 of chap. 3 of Order 1,196; since, if it did not charge that crime, it is plain it charged none within the jurisdiction of the Police Court.

The subdivision declares that no person shall " address to another or utter in the presence of another any words, language, or expressions having a tendency to create a breach of the peace." We shall not inquire, in this place, how it accords with constitutional law or the policy of our general legislation, to place the power in the hands of a judge or jury to decide that " any words "—to others, perhaps, apparently innocent— which they may think objectionable, have a tendency to create a breach of the peace. That the language charged in the particular instance now before us was not only indecorous, but in the highest degree indecent, cannot affect the question. The next conviction may be for the use of words less offensive, and the attempted definition of the crime sought to be created by the ordinance is so uncertain, as would leave it to the varied judgments or tastes of successive juries to find defendants guilty or not guilty of a crime for the use of exactly the same language. It may be that the Legislature might declare slander to be a crime, or might authorize a municipal board so to declare. If this were done, however, it can hardly be doubted that the constitutional provisions in respect to libel would apply. The question whether the words spoken were slanderous would be a question for the jury, and the defendant would be allowed to prove, if he could, that the words spoken were true, and that they were spoken for justifiable ends. The provision of the ordinance on which (as is claimed) petitioner was convicted, does not require that words shall be slanderous, and does not permit the defendant to prove either the truth or justifiable intent. Libel is distinguished from slander in that it is supposed to be more deliberate. The freedom of the press is surrounded by many constitutional safeguards. Can a Legislature—*a fortiori*,

a City Council—sweep all these aside by a simple process of calling libel by another name?   The Legislature cannot deprive a publisher of a newspaper of his right to prove the truth of a statement alleged to be libelous, and that it was published for justifiable ends.   Will it be contended that the printer may be deprived of this great constitutional right by providing that he shall be punished, not for libel, but for the publication of words having a tendency to produce a breach of the peace ?

The foregoing will suggest some of the evil consequences which might ensue were we to give the construction contended for by counsel to the third subdivision of section 28 of the chapter, and hold that it covers the case of one who may have used words having a tendency to excite the wrath—in case he should ever hear of them—of a person of whom the words were spoken, although such person may not have been present when the words were spoken, nor may ever have heard them recited. We cannot too often repeat that the alleged circumstances of this particular case should not be appealed to as requiring of the Courts to attribute a forced meaning to the ordinance.   It may be admitted, for the purpose of this argument, that the language alleged to have been employed by the petitioner conveyed a vile and perfectly unwarrantable assault upon the character of an honorable man.   But it is only when an offense particularly aggravating against morals or justice has been committed, that a temptation arises to distort the law, to expand the meaning of words beyond their plain purport, to give to a penal statute an effect not intended by those who framed it nor required by its language, that we may bring within its scope, and subject to condign punishment, those whom we believe deserve the severest penalties.   At such times, if ever, we forget that the worst as well as the best of men is entitled to the protection of the Constitution, and that a strained interpretation of the law which deprives a bad man of his right to personal liberty to-day, may to-morrow deprive a good man of his equally sacred—in the eyes of some of us perhaps more sacred—rights to property.

To constitute the offense, the words must either be addressed to, or spoken in the presence of, the person whom they have a tendency to incite to a breach of the peace, or, on the other hand, they are punishable if spoken anywhere, or addressed to

any third person.   Even if the language of the ordinance were
ambiguous, we would be compelled to reject an interpretation
which would sustain the latter view.   To hold that the conver-
sation of intimate friends may be reported, or the privacy of
domestic circles invaded, to secure evidence of declarations,
which, if subsequently communicated to the person to whom
they relate, may, in the opinion of a jury in the Police Court,
" have a tendency " to induce him to commit a breach of the
peace, would recognize and encourage a system of espionage ab-
horrent to American ideas, and productive of more evil than the
practice condemned.   Such evidence necessarily would be of the
dubious character of which Mr. Greenleaf speaks in his treatise
on " Evidence."   All that he says of oral admissions is applica-
ble to the repetition of what one may " utter to or in the pres-
ence of another " ; especially in the absence of the person spoken
of.   " With respect to all verbal admissions, it may be observed
that they ought to be received with great caution.   The evi-
dence, consisting as it does, in the mere repetition of oral state-
ments, is subject to much imperfection and mistake, the party
himself either   *   *   *   not having clearly expressed his own
meaning, or the witness having misunderstood him.   It fre-
quently happens, also, that the witness, by unintentionally alter-
ing a few of the expressions really used, gives an effect to the
statement completely at variance with what the party actually
did say."   (Greenl. Ev. § 200.)

Such an interpretation of the orders would revive a kind of
judicial investigation for which there have been no precedents in
this country, and none in England since the reign of Edward
the Fourth, when a citizen of London was hanged, who had said
he would make his son an heir of the " crown," the sign of the
house in which he lived ; and a gentleman, whose favorite buck
the king had killed in hunting, was decapitated because he had
wished it, horns and all, in his belly, that counseled the king to it.
(1 Hale's P. C. 115.)   To say that a prosecution, such as has
been mentioned, may be maintained by virtue of an ordinance,
the sole authority to pass which is found in the city charter
above cited, by which the Supervisors are empowered to " reg-
ulate all occupations,   *   *   *   exhibitions, and practices
which are against good morals, contrary to public order, or dan-

gerous to the public ·safety," is to declare a doctrine which, if
not subversive of constitutional principles, is apparently viola-
tive of established rules relating to municipal legislation.

Municipal by-laws must harmonize with the general laws of
the State, with the municipal charter, and with the principles
of the common law.   (14 Barb. 478; 4 Hill, 209.)   They must
also be reasonable, and whenever they appear not to be, the
Courts will, as matter of law, declare them void.   (2 Kyd on
Corp. 107.)   We have no space to amplify the suggestion, but
there is at least grave doubt whether an ordinance which pro-
vides a punishment of six months' imprisonment and $1,000 fine
as the penalty for incautious words spoken of an absent person,
at the breakfast table, (which may arbitrarily be considered by
a jury as having a tendency to create a breach of the peace)
would be "reasonable," or held to be authorized under a gen-
eral grant of power to the Supervisors to prohibit or regulate
practices "against good morals, or contrary to public order, or
dangerous to the public peace."   That such an ordinance would
not accord with our governing policy is further evidenced, per-
haps, by the circumstance that no like prohibitory legislation
has ever been attempted in this or other States.

We have assumed, for the purpose of this decision, (although
the contrary course, the precise objection not being made, has
been repeatedly pursued by the Court, as also in the United
States Courts—notably in Parrott's and other recent cases) that
the invalidity of the Orders 197 and 1,196 ought not to be deter-
mined in this proceeding, and made the ground for petitioner's
discharge.   We have assumed—for the purposes of this de-
cision only—that here, on *habeas corpus*, the Police Court will
be presumed to have adjudged the order valid, and that its
judgment in that regard is to be treated as final.   But in ascer-
taining the meaning of the portion of the Order 1,196, on which
the judgment against the petitioner is based, we may very prop-
erly consider the circumstance, that if the language, supposing
it be ambiguous, be construed in one way, it does not necessa-
rily conflict with the municipal charter or with the common or
statutory law ; while, if it be construed in another manner, it is
either clearly repugnant to all these, or leaves the judicial mind
with grave doubts whether it contravenes State legislation, or im-

pinges upon the due enjoyment of constitutional and legal rights. It is the ordinance properly construed which the Police Court has adjudged to be valid.

We have so far considered subdivision 3 of § 28 as if its language would admit of two interpretations. But we are unable to discover any ambiguity in it. It declares, no person shall " address to another, or utter in the presence of another, any words * * * having a tendency to create a breach of the peace." If the second clause of the sentence had been omitted, and the subdivision had read, " address to another any words * * * having a tendency," etc., could anybody have doubted what it was intended to prohibit? There could have been no hesitation in declaring that the words must be such as to have a tendency to produce a breach of the peace on the part of the person to whom they are addressed. There is nothing in the language, " or utter in the presence of another," which can enlarge the scope of the intended prohibition. " No person shall address to or utter in the presence of another person words having a tendency to induce such other person to commit a breach of the peace." Is not this a simple paraphrase of the language of the ordinance? Either this truly represents the meaning, or, as we have seen, the subdivision prohibits the utterance of words which can be construed as having a certain tendency— in private, to the smallest audience, and in the absence of the only person who would have reason to be offended by them— a construction which might be supposed grievously to interfere with the inalienable privileges of certain coteries. It is certain that the ordinance does not require that more than two persons should be present when the words are spoken. If it had been intended to punish the denunciation of absent individuals at public assemblages, it would seem that language would have been employed somewhat like that of the Act of January 19th, 1878, (which was repealed at the next session of the Legislature) : " Any person who, in the presence of twenty-five or more persons, shall utter any language with intent to incite * * * to any acts of violence," etc. Certainly, if the purpose had been to prevent appeals to a riotous mob, such as were calculated not only to incite those present to violence, but also to lead to breaches of the peace on the part of absent persons de-

nounced, it would not have been difficult to find apt and fitting words to express that purpose. For actual riotous conduct the remedy is the strong arm of the government efficiently wielded, as we have no doubt it will be if the occasion arises, by the executive power. But the purpose of the third subdivision of § 29 of Order 1,196 is less comprehensive, and seems very apparent. The law has always given weight to the provocation which leads to an assault; insulting words and conduct in the presence of the assailant may sometimes reduce the degree of his crime, and may always be considered in mitigation of punishment.

The portion of the ordinance so often referred to provides a penalty for him who shall provoke an assault upon himself " by addressing to another person, or uttering in the presence of another person, words    *    *    *    having a tendency to create a breach of the peace."

The judgment of the Police Court, separate from the extraneous recitals which constitute no part of it, is simply, " It is ordered and adjudged that    *    *    Denis Kearny pay a fine of $1,000, and be imprisoned in the House of Correction of the city and county for six months." Does the record of the proceedings of the Police Court show that the Court had jurisdiction to render this judgment? The case is unembarrassed by another question, since no oral evidence was offered to establish that he was in fact tried and convicted for the commission of any act other than that charged in the complaint, nor is there any entry in the minutes of the proceedings, in any degree, looking toward a prosecution for the commission of any other act. The complaint charges, that at a certain date, in San Francisco, the petitioner " did willfully and unlawfully utter and address to others, to wit, to a large number of persons then and there assembled, to wit, 100 and more persons whose names are unknown to deponent, certain profane words and language, which words and language then and there had a tendency to create a breach of the peace." Then follows a recital of the words alleged to have been spoken. There is no averment that the words were " addressed to or uttered in the presence of " the person of whom they were spoken. But that the words are addressed to or uttered in the presence of the person with respect to whom they

are spoken, constitutes, as we have seen, the very gist of the offense created by the third subdivision of § 28 of chapter 3, of the city charter. Unless we adopt the construction of the language of subdivision 3 which we have already rejected, however reprehensible the alleged action of petitioner, he did not commit the particular crime there defined—though he uttered the words in the presence of any number of persons other than him of whom he spoke.

This is not the case of a complaint inartificially drawn, which intimates the existence of the facts necessary to the constitution of the offense, or even of an attempted statement, insufficient, but indicating a purpose to declare on the essential facts. It is a total failure to allege any cause of action, and, however objectionable the conduct imputed to the petitioner, he is no more, in the eye of the law, charged by the complaint with any crime, than if the paper had ascribed to him the most innocent of deeds. If Denis Kearny was legally convicted under the ordinance by reason of his denunciation of a person in his absence, then each one of those who have employed similar (though sometimes less profane) language in respect to Denis Kearny, he not being present, may be imprisoned and fined by the Police Court.

It would seem that criminal actions in the Police Court must be commenced by complaint in writing, (Penal Code, § 1426) and that the Court is required to keep a docket in which must be entered each action and the proceedings therein. (Penal Code, § 1428.) As to the jurisdictional facts which the law directs to be set forth on the records of that Court, they must be apparent on the face of the proceedings, or its judgment is void. (*Jolley* v. *Foltz*, 34 Cal. 321.) If, however, it should even be admitted that it might be established by proof *aliunde* that the petitioner was tried and convicted of an offense of which the inferior court had jurisdiction, no evidence of any kind to establish that fact has been produced.

Inasmuch as it affirmatively appears from the record of the proceedings that the petitioner was tried and sentenced to be punished for the commission of an act which is and under the existing laws can be no crime, the judgment of the Police Court

is absolutely void. The petitioner must, therefore, be discharged from custody.

It is so ordered.

McKee, J., Sharpstein, J., and Ross, J., concurred.

Thornton, J., concurring:

I concur in the reasoning and the result reached in the opinion signed by my brethren, McKinstry and others. In doing so I desire to add that I do not wish to be considered as concluded by anything contained in that opinion, as to a judgment or sentence of any court of criminal jurisdiction known to the Constitution and laws of this State. I am strongly inclined to the opinion that the same result must be reached upon a so-called judgment of any of the Superior Courts, when there is nothing in the shape of law to maintain the judgment. It must be remembered that we have no criminal common law. All our public offenses or crimes are statutory. Unless a statute exists making an act a crime or a public offense, (see Penal Code, § 6) no one can be adjudged to suffer punishment for the commission of it, however heinous it may be when tested according to the ordinary criterion of public duty or public obligation. To hold that any court of criminal jurisdiction can adjudge an act, not a public offense by statute, deserving of punishment and sentence, and commit to prison or fine for the commission of such an act, which, in such a condition of the law, is innocent, and that the person so sentenced could not be relieved from it on *habeas corpus*, would be, it seems to me, to hold that the court is invested not only with judicial, but with legislative power—that the court can make the law, create the offense, and adjudge a prisoner guilty of having committed it. The court in such a case would have no jurisdiction; as was said by the learned Judge who wrote the opinion in Corryell's case (22 Cal. p. 181): "The court derives its jurisdiction from the law, and its jurisdiction extends to such matters as the law declares criminal, and none other, and when it undertakes to imprison for an offense to which no criminality is attached, it acts beyond its jurisdiction." Such cases, it is evident, must be of rare occurrence. They are the offspring of peculiar circumstances, which happen infre-

quently. When they do occur, and are presented for adjudication, should not the court be as ready in such emergencies to relieve on *habeas corpus* as to enforce the legal punishment in case of guilt?" (See *People* v. *Liscomb*, 60 N. Y. 569, 570.) I fail to see that any serious consequences can flow from such a use of the writ of *habeas corpus*, unless an injury can result from the enlargement of an innocent person, whom some court has, by grievous mistake and illegal sentence, adjudged to suffer confinement in prison.

However, the question is not before us for decision, and these few observations are intended to preclude a conclusion which might possibly be drawn from the opinion of the Court, and to state the point without deciding it.

MYRICK, J. : I find myself unable to concur in the conclusions reached by my associates.

MORRISON, C. J. : I dissent.