[Crim. No. 79. Third Appellate District.—February 23, 1909.]

## Application of L. L. McCOY for Writ of Habeas Corpus.

HABEAS CORPUS—TEST OF VALIDITY OF ORDINANCE—ARREST—BAIL IN THIS COURT—RETURN—EVIDENCE—OBJECTION TO MOOT QUESTION ON FINAL HEARING.—Upon a writ of *habeas corpus* applied for to test the validity of a county ordinance, for the violation of which the petitioner was held under arrest until admitted to bail by this court pending the proceedings, the sheriff's return to which set forth the facts, after which the case was continued for evidence in full, which covered several hundred pages, the respondent will not be permitted upon the final argument to contradict the return, and urge, for the first time, that the case presents only a moot question.

ID.—JURISDICTION TO DETERMINE VALIDITY OF ORDINANCE ON HABEAS CORPUS.—This court has jurisdiction to determine the validity of an

ordinance upon writ of *habeas corpus*, and to discharge the prisoner, when the facts appearing before the court established its invalidity; and it may go beyond the face of the process to determine that matter.

ID.—INQUIRY INTO FACTS NOT JUDICIALLY KNOWN—EVIDENCE.—This court may inquire into facts not judicially known bearing upon the question of the validity of the ordinance, by the taking of evidence to enable it properly to determine that question, as provided in section 1484 of the Penal Code.

ID.—COUNTY ORDINANCE REGULATING SHEEP BUSINESS—LICENSE TAX— POLICE POWER—ORDINANCE NOT CONCLUSIVE OF REASONABLENESS.— A county ordinance regulating the business of sheep raising and grazing in the county, and imposing a license tax therefor, in the exercise of the police power, is not conclusive that the amount of the tax is reasonable.

ID.—JUDICIAL QUESTION—CAUTIOUS EXERCISE OF JUDICIAL POWER.—It is always a judicial question whether a particular regulation of the right to pursue a useful business is a valid exercise of the police power, though the authority of the courts to declare any regulation invalid will be exercised with the utmost caution. An ordinance must be clearly shown by the attacking party to be obnoxious and unreasonable to authorize the interference of the court.

ID.—SELECTING PARTICULAR USEFUL BUSINESS OF SHEEP RAISING AND GRAZING—EXCLUSION OF ALL OTHER DOMESTIC ANIMALS—UNJUST LAW.—The selection for regulation under a license tax of the particular useful business of raising and grazing sheep, which is a necessary branch of agricultural life, and is as ancient as civilization, to the exclusion of cattle, horses, mules, goats, and other domestic animals, is difficult to reconcile as a just law.

ID.—CONSTRUCTION OF LEGISLATIVE ACT—LIMIT OF POWER TO FIX LICENSE FEE—GRANT OF POWER NOT IMPLIED.—The act of 1903, providing a limit of power to fix a license fee for the business of raising, herding and pasturing sheep, and providing that any ordinance fixing a rate in excess of five cents per head is void, is not to be construed by implication as granting power to fix the fee at five cents per head.

ID.—POWER OF LEGISLATURE.—The legislature cannot itself impose an unreasonable license tax upon a useful business, and much less has it the power to delegate such authority to a municipality.

ID.—ACT OF 1907—LIMITATION OF POWER TO IMPOSE LICENSE TAX— IMPLIED REPEAL.—The act of 1903, so far as it is inconsistent with the act of 1907, expressly limiting the power to tax the business otherwise than for regulation only, must give way to the later law.

ID.—FORMER ACT NOT SUPPORTING ORDINANCE.—If it be found to be true that an ordinance tax imposed for regulation only, under the act of 1907, at the rate of five cents per head, greatly exceeds any tax

required to regulate the business, such tax can find no support in the former act of 1903.

Id.—Evidence—Motives—"Purpose" of Ordinance.—While the motives of an ordinance cannot be inquired into, its "purpose" within the meaning of the act of 1907, whether it be for the lawful "purpose of regulation only," or be found from evidence of the circumstances in the light of existing conditions proved to be for the "unlawful purpose of revenue," is a legitimate subject of inquiry.

Id.—Excessive Tax—Purpose of Revenue—Void Ordinance.—When the court can plainly see from the evidence before it that the license tax was imposed for the purpose of raising a large revenue, under the guise of regulating the business, the provision for the tax cannot stand as an exercise of police power; and it appearing in proof that the license tax was here imposed upon the business of raising and pasturing sheep having an assessed value of about half a million dollars, and that the revenue therefrom amounts to more than one-half of the general and road funds derived from the property tax on more than ten times that assessed value, besides other considerations clearly showing that the license tax was imposed in order to obtain a large revenue, the ordinance imposing it must be held void.

Id.—Meaning of Word "Regulate"—Expenses Allowed.—All the definitions of the term "regulate" restrict its meaning to providing a rule for conducting the business to be regulated, to inspection and police supervision and oversight, and the license tax for regulation must have relation to expenses incurred for these purposes. It may not be gauged upon an estimate of consequences or damages which may result from the business.

Id.—Right to Use Public Roads—Damage not Allowed.—The use of the public roads is not to be denied to those in the sheep industry. They have the same right to their use as other citizens. The damage to the public roads cannot be allowed as an item of expense in regulating the sheep business.

Id.—Right to Tax Lambs.—It seems that the ordinance is subject to the objection that it taxes lambs which are not taxed for state and county purposes. The objection is discussed, but held unnecessary to decide, the ordinance being clearly void as a revenue measure.

APPLICATION for discharge upon writ of *habeas corpus* to the sheriff of Lassen County.

The facts are stated in the opinion of the court.

McCoy & Gans, and Pardee & Pardee, for Petitioner.

R. M. Rankin, District Attorney, and C. E. McLaughlin, for Respondent.

CHIPMAN, P. J.—Petitioner was, on August 3, 1908, complained against for a misdemeanor in violating an ordinance of the county of Lassen requiring a license to be paid for raising, grazing, herding and pasturing sheep and lambs within said county; a warrant of arrest was issued by a justice of the peace and was duly served by arresting the defendant (petitioner here) and bringing him into the magistrate's court on said day, whereupon he was committed to the custody of the sheriff of Lassen county "pending the calling of his case for trial" and was by the sheriff taken into custody. Petitioner thereupon, to wit, on August 5, 1908, presented his petition to this court, alleging his imprisonment under said commitment, and the writ was ordered to issue directing the sheriff to produce the prisoner and have him in court on August 14, 1908, "and that in the meantime said petitioner be released on bail in the sum of $100.00 cash." In his return the sheriff states that petitioner was committed to his custody by virtue of the commitment and was detained by virtue thereof; "that upon the service of said writ the said L. L. McCoy was admitted to bail in the sum of $100.00 cash as ordered by said writ, and that since such time the said L. L. McCoy has not been in, and is not now by me imprisoned or detained." The matter came on to be heard on August 14, 1908, and was fully argued. It appearing, however, that the issues presented were such as to require evidence to be taken the court accordingly so ordered and appointed a commissioner for that purpose. The further hearing was continued until October 31, 1908. Meantime, the commissioner, without objection of respondent, proceeded to take testimony, of which there are several hundred pages, and many exhibits. For the first time, at the hearing, October 31st, the point was made by respondent that the case is moot and the writ must be dismissed. Citing *Ex parte Schmitz,* 150 Cal. 664, [89 Pac. 438]. The facts here are wholly unlike the facts in that case and in the case of *Ex parte Gow,* 139 Cal. 242, [73 Pac. 145]. The rule there applied was for the protection of the court against cases made for the sole purpose of testing the validity of the law under which the arrest was made and where the arrest was voluntary and procured by the defendant, not because he was being detained and deprived of his liberty, for in one of those cases the defendant was already enlarged

on bail and the other on his own recognizance. Here the defendant was arrested and committed to the custody of the sheriff and, as shown by his return, remained in his custody until admitted to bail by this court pending the hearing of the writ. Petitioner, in his petition, set out the complaint and warrant of arrest and alleged: "that upon said warrant of arrest your petitioner was, on the 3d day of August, 1908, arrested and taken into custody by said sheriff, and ever since said time, your petitioner has been, and now is, under said arrest and in said custody and restrained of his liberty as aforesaid." This was not denied in the sheriff's return and is answered as above set forth. Upon this record the court ordered evidence to be taken and the cause continued for that purpose, and not until the case came on for final argument and after the parties had been put to much expense was any suggestion made that the case is moot. Respondent should have made the objection, if it had any merit, at an earlier stage of the proceeding, and not having done so we think he should not now be permitted to come in and contradict his return.

Section 1 of Ordinance No. 82, passed January 11, 1908, by the Lassen county board of supervisors, for the violation of which the petitioner was arrested, provides that "Every person, association, firm or corporation engaged or engaging in the business of raising, grazing, herding or pasturing sheep or lambs within the county . . . must annually, at the time of engaging in said business each year, procure a license therefor from the license tax collector of said county, and must file the affidavit hereinafter provided for and pay a license fee or charge of five cents for each sheep or lamb raised, grazed, herded, or pastured within Lassen County by such person. . . ." Section 2 provides that in order to procure the license the person must file with said license tax collector, with the application, an affidavit showing the number of sheep and lambs then or thereafter to be raised, grazed, herded or pastured within said county; whether said sheep or lambs are or have been infected with scab or any other infectious or contagious disease, and if so, when and where they were located when so infected; the portion of the county in which they are to be grazed, etc., during the current year; whether the applicant has previously raised, herded, grazed or pastured

sheep or lambs in said county, and, if so, in what part thereof; when, where and by whom said sheep and lambs have been "dipped"; when the applicant will engage in said business in said county. If it appears from said affidavit that such sheep or lambs are suffering from an infectious or contagious disease, the tax collector must refuse to issue such license, otherwise he shall, upon payment of the fee above provided for, issue the license. Section 3 provides that the collector may, whenever he may deem it expedient, verify the statements made in the affidavit, "in such manner as he may deem best," and if he finds that any false statements have been made in the affidavit, he must report the same to the district attorney, "and the cost of making such examination and investigation shall be a county charge to be allowed as other claims against the county." Section 4 provides that every applicant for a license must, upon demand of the license collector, corral or confine his sheep and lambs in such manner as to enable the license collector to make said examination, "and any person . . . refusing to comply with such demand will be guilty of a misdemeanor." Section 5 makes it the duty of the collector to file and examine all affidavits for licenses and to collect the license fee. Section 6 makes it "unlawful for any person . . . to bring within said County of Lassen any sheep or lambs known to be suffering from any infectious or contagious disease." Section 7 makes it unlawful for "any person . . . engaged in said business of raising . . . sheep or lambs within the county of Lassen to allow or permit the dead body of any sheep or lamb owned, controlled or possessed by them to remain within five hundred yards of any public highway or inhabited dwelling or running stream of water within said county," and it is made the duty of such person to bury or otherwise dispose of the carcass of such sheep or lamb. Section 8 makes it unlawful for any person ". . . to corral or allow their sheep or lambs to rest or remain on any public highway within said county of Lassen." Section 9 makes it "unlawful for any person . . . to erect or maintain sheep corrals, or tanks or other appliances used for the purpose of dipping sheep or lambs within two hundred yards of any public highway . . . or within one-half a mile of any public school building, village or town in said county." Section 10 makes it "unlawful for any person . . . to herd,

graze or pasture sheep or lambs on or over the public highways in said county." Section 11 makes it "the duty of every person . . . engaged in the business mentioned in this ordinance in Lassen County to carry on or conduct said business in such a manner as to cause no injury or damage to any public road or highway . . . that can without inconvenience and without great cost be avoided." Section 12 makes it "unlawful for any person . . . engaged in the business mentioned in this ordinance to drive more than one hundred sheep or lambs at one time on any bridge maintained by said County of Lassen upon any public highway therein." Section 13 makes it "unlawful for any person . . . engaging in the business mentioned in this ordinance to vend, peddle or offer for sale within said County of Lassen any meat from any sheep or lamb infected with any contagious disease." Section 14 makes it "unlawful for any person . . . engaged in the business mentioned in this ordinance to herd or drive any sheep or lambs through or along the streets of any town or village in said Lassen County." Section 15 makes it unlawful for any person engaged in said business in said county "to leave the carcass of any dead sheep or lamb in which said person . . . has placed any strychnine or arsenic or other deadly poison within the said county." Section 16 makes it unlawful for any person engaging in said business in said county "to herd any band of sheep or lambs in or about any ditch, stream or reservoir in Lassen County from which water is furnished to the inhabitants of any town or village in said county in such manner as to pollute the water of said stream, ditch or reservoir." Section 17 makes it the duty of every person engaged in said county in the business mentioned in said ordinance "while passing over the trails and roads of said county to so herd his said sheep and lambs that the same shall travel in said trails and roads and not on the banks thereof nor on the hillsides immediately above the same, except at the places where it is necessary to do so in leaving said trail or road, or in crossing the same to reach any objective point"; and it is made the duty of such person "while traveling over the public roads and trails of said county, at the approach of any stage, wagon or other vehicle driven by any person, and containing any person or persons, to so herd said sheep and lambs as to make without any unnecessary delay a

passageway through the same and permit said traveler or travelers to pass, and likewise any horseman to pass''; and it is made unlawful for any person in charge of sheep or lambs ''to unreasonably delay any of the people of this state in their lawful passage over said trails or roads.''   Section 18 declares that ''Every person . . . violating any of the provisions of this ordinance shall be guilty of a misdemeanor.'' Section 19 fixes a penalty of five cents for every sheep and lamb raised, grazed, herded or pastured in said county by any person engaging in the said business in the county, without having first procured a license, and he shall be liable to a civil action to recover said penalty to be brought by the district attorney in the name of the county.   Section 20 makes it the duty of the license collector and all peace officers in their respective townships to enforce the provisions of the ordinance and to report to the proper officers every person violating said ordinance, ''and all claims for services rendered for expenses incurred by said license collector or said peace officers in performing the duties imposed upon him or them by this section'' shall become a charge against the county. Section 21 requires the county auditor to prepare and have printed suitable blank licenses with blank receipts.   Section 22 provides that all money collected under the ordinance shall be placed to the credit of the general fund.   Section 23 provides that the ordinance shall take effect fifteen days after its passage and repeals all conflicting ordinances, with the proviso that existing ordinances shall remain in force as to all pending civil and criminal actions and also that the right of the county to commence any actions which have accrued under the existing ordinances shall be deemed to be continued in force.

This ordinance was passed pursuant to and, as claimed by respondent, agreeably to the power given to the board of supervisors by subdivision 22, section 4041, of the County Government Act of 1907 (Stats. 1907, at p. 370).  See, also, section 3366 of the Political Code (Stats. 1901, p. 635).  The power granted to boards of supervisors, by the act of 1907, is: ''To license, in the exercise of their police powers, and for the purpose of regulation, as herein provided, and not otherwise, all and every kind of business not prohibited by law, and transacted and carried on within their respective jurisdictions . . . to fix the rate of license tax upon the same, and

to provide for the collection of the same by suit or otherwise.'' Section 3366, Political Code, is couched in the same terms.

It is contended by petitioner: 1. That the license tax imposed by the ordinance in question is not in the exercise of the police powers of the board; 2. That the purpose of the ordinance and license tax is revenue and not regulation; 3. That the amount of the tax imposed is burdensome, oppressive, and unreasonable; 4. That the purported regulatory provisions of the ordinance are burdensome, oppressive, and unreasonable; 5. That many of these purported regulatory provisions are unreasonably and unlawfully discriminating against those engaged in the business sought to be regulated; 6. That the tax imposed upon lambs is burdensome, oppressive, and unreasonable, and is in violation of the act of February 26, 1903, entitled ''an act restricting the powers of boards of supervisors in the matter of imposing licenses upon the business of raising, herding, grazing and pasturing sheep.'' (Stats. 1903, p. 41.) This act forbids the imposition of a license tax greater than five cents per head ''on the business of raising, herding or pasturing sheep.''

Certain questions arose at the argument which should first be disposed of. 1. It is claimed that the court cannot go beyond the face of the process to determine its validity except to inquire into the jurisdiction of the committing magistrate; that as he clearly had jurisdiction by the terms of the ordinance and as the process is without flaw on its face there is an end of the matter. But this assumes that no infirmity of the ordinance, which is the basis of the imprisonment, can be inquired into on *habeas corpus,* and this, we think, is too broad a claim.

In *Ex parte Hollis,* 59 Cal. 405, the court said: ''Of course, where a court has jurisdiction of the subject matter, and the parties, its judgment is not reversible on such process. Being conclusive, courts will not go behind it to ascertain whether any errors of law were committed in the proceeding in which it was rendered. But the judgment is not conclusive upon the question of the authority of the court that rendered it. That, as well as any other matter which would render the proceeding void, is always open to inquiry. It were a legal absurdity to say that a judgment of conviction, valid in form, precluded inquiry into authority to render it.'' In *Ex parte Siebold,* 100 U. S. 371, the validity of an act of Congress was

assailed. The court said: "An unconstitutional law is void, and is no law. An offense created by it is not a crime. A conviction under it is not merely erroneous, but is illegal and void, and cannot be a legal cause of imprisonment. It is true if no writ of error lies, the judgment may be final in the sense that there may be no means of reversing it. But personal liberty is of so great moment in the eye of the law, that the judgment of an inferior court affecting it is not deemed so conclusive but that the question of the court's authority to try and imprison the party may be reviewed on *habeas corpus.*" The power of the court to examine into the validity of an ordinance on *habeas corpus* is fully considered in *Ex parte Kearney,* 55 Cal. 212. (See, also, *Ex parte Keeney,* 84 Cal. 304, [24 Pac. 34]; *Ex parte Hodges,* 87 Cal. 162, [25 Pac. 277]. See, also, 15 Am. & Eng. Ency. of Law, p. 204, and notes.)

2. It is also claimed, as a sequence of the foregoing proposition, that the court cannot on *habeas corpus* take evidence upon disputed questions of fact; that the writ must be granted, if at all, upon the petition and return. Section 1484 of the Penal Code specifically confers the right upon the defendant to controvert any of the material facts set forth in the return, "or allege any fact to show either that his imprisonment or detention is unlawful, or that he is entitled to his discharge"; and it authorizes the court "to proceed in a summary way to hear such proof as may be produced against such imprisonment," and the court is given "full power and authority to require the attendance of witnesses . . . and to do and perform all other acts and things necessary to a full and fair hearing and determination of the case." In *Ex parte Cottrell,* 59 Cal. 420, it was held that if the return shows that the party seeking the writ is illegally detained, he may controvert the facts and allege any facts showing his unlawful detention. "In case he does so, he may introduce evidence to prove any issue which he thus raises." In the case of *In re Smith,* 143 Cal. 368, [77 Pac. 180], the facts pleaded in the petition were such as necessarily were *de hors* the ordinance; these facts were beyond the process and return and upon them the court declared the ordinance to be unreasonable and oppressive, an invasion of petitioner's constitutional rights and therefore void. (See, also, Church on Habeas Corpus, secs. 160-165, 169-177, 230; Encyclopedia of Evidence, pp.

342, 343, 350, and notes; 15 Am. & Eng. Ency. of Law, p. 197.) Believing these views to be correct, we made the order for taking evidence, and we see no reason now to refuse to consider the evidence thus taken. *County of Plumas* v. *Wheeler*, 149 Cal. 758, [87 Pac. 909], relied upon by respondent, has not been overlooked. The question there arose on a demurrer to the complaint and the court said: "On the record before us, consisting simply of the complaint and the demurrer, the validity of the ordinance must be determined from an inspection of its provisions alone, read in the light of facts within the judicial knowledge of the court." It is because the facts set forth in the petition and denied by respondent are not within judicial knowledge, and if true would seem to show the ordinance to be oppressive and unreasonable and therefore void, that evidence was ordered to be taken.

3. The contention that the action of the supervisors in adopting the ordinance is conclusive of its reasonableness and particularly as to the amount of the license tax, deserves attention, but we think it is not maintainable. Our reports abound with cases controverting this contention. Among them may be cited *Ex parte Frank*, 52 Cal. 606, [28 Am. Rep. 642]; *Ex parte Whitewell*, 98 Cal. 73, [35 Am. St. Rep. 152, 32 Pac. 870]; *Ex parte McKenna*, 126 Cal. 429, [58 Pac. 916]; *City of Sonoma* v. *Curtin*, 137 Cal. 583, [70 Pac. 674]; *In re Smith*, 143 Cal. 368, [77 Pac. 180]; *Plumas County* v. *Wheeler*, 149 Cal. 758, [87 Pac. 909]. And a very instructive case is *Postal Telegraph-Cable Co.* v. *Taylor*, 192 U. S. 64, [24 Sup. Ct. 208]. In the case *In re Smith*, 143 Cal. 368, [77 Pac. 180], the court said: "When the police power is exerted to regulate a useful business or occupation, the legislature is not the exclusive judge as to what is a reasonable and just restraint upon the constitutional right of the citizen to pursue any trade, business, or vocation which in itself is recognized as innocent and useful to the community. It is always a judicial question if any particular regulation of such right is a valid exercise of police power, though the authority of the courts to declare any regulation invalid will be exercised with the utmost caution, and only when it is clear that the ordinance or law declared void passes the limits of the police power and infringes upon rights guaranteed by the constitution." Quoting from *Lawton* v. *Steele*, 152 U. S.

133, 137, [14 Sup. Ct. 499], the court said: "To justify the state in thus interposing its authority in behalf of the public, it must appear, first, that the interests of the public generally, as distinguished from those of a particular class, require such interference, and second, that the means are reasonably necessary for the accomplishment of the purpose, and not unduly oppressive upon individuals. The legislature may not, under the guise of protecting the public interests, arbitrarily interfere with private business, or impose unusual or unnecessary restrictions upon lawful occupations. In other words, its determination as to what is a proper exercise of its police powers is not final or conclusive, but is subject to the supervision of the courts." It will not for a moment be contended that the business of raising sheep is not a useful and necessary branch of our agricultural life; it ranks as one of the most important occupations of the farm, and is deemed of such worth as to call for special protection by national law; it antedates the cultivation of the soil and is as ancient as civilization itself. Indeed, it is difficult to reconcile as just a law that would single out this pursuit for regulation among all the varied farm industries of the state to the exclusion of cattle, horses, mules and goats and all other farm industries.

4. But it is contended that the legislature, by implication, conferred authority upon the supervisors to fix the license fee at five cents per head, in the act of 1903 (Stats. 1903, p. 41). It is there provided "that no license or licenses greater than five cents per head shall be imposed by the boards of supervisors of any county on the business of raising, herding or pasturing sheep, and any and all licenses imposed by the board of supervisors of any county on the business in excess of five cents per head shall be and are hereby declared to be void." In the first place, the assumption that the legislature has here granted the power to fix the fee at five cents per head is not warranted by the language of the act, for it is declared to be "an act restricting the powers of boards of supervisors." The act, if construed to give the power to fix the license fee the amount mentioned, is a limitation beyond which they may not go, and is not a grant to fix that amount. But if this distinction has little weight, it still remains true, as we have shown, that the legislature has no power to impose an unreasonable tax, much less has it power to delegate such power to a municipality. Besides, the act of 1907, *supra,*

declares that the supervisors shall have power to impose a license tax for the purpose of regulation and not otherwise; and if 'five cents per head levied as a license tax upon sheep and lambs (the latter not mentioned in the act of 1903) is such excess of that required for regulation as to show that the purpose of the ordinance was not for regulation alone, but was for the purpose of raising revenue, then the act of 1903, so far as it attempts to place a maximum limit of the tax, is inconsistent with the act of 1907 and must give way to it. In other words, the later act forbids the levying of any license tax other than for purposes of regulation, and if it be true that a tax of five cents per head is greatly in excess of any tax required for regulating the business, the act of 1903 furnishes no support to the ordinance. In *Ex parte Pfirrmann*, 134 Cal. 143, [66 Pac. 205], the court gave its meaning of the Political Code, section 3366, found in the act of 1901, and, quoting the act, said: "This language is too plain to be construed. It speaks for itself, and declares that boards of supervisors may issue licenses for the purpose of regulation alone. The words 'not otherwise' curtail and cut off all power boards of supervisors theretofore had to issue licenses and charge therefor as a revenue measure. . . . Further than that, it may be said that the trend of our state policy at the present time looks toward a cessation of legislation which has for its purpose the raising of revenue by the collection of direct taxes, under the guise of license, as a condition precedent to the conduct of business. Such legislation seems to be considered an impolitic burden resting upon legitimate business, and a fine upon commercial enterprise."

5. It is claimed that if there is any evidence, however slight, upon which the board could base their action, the court will not inquire further, but will deny the writ. The courts have expressed themselves upon this point frequently, but nowhere, so far as we have found, to the effect that "any evidence, however slight," will close the doors against relief by the writ. It has been said that "a clear case should be made to authorize an interference on the ground of unreasonableness." (*In re Smith*, 143 Cal. 368, [77 Pac. 180]; *Sonora v. Curtin*, 137 Cal. 583, [70 Pac. 674].) "When the validity of an ordinance is attacked on the ground that it is unreasonable, the burden of showing its unreasonableness is

upon the person attacking it." (*Ibid.*)   Again, the ordin-
ance "must be very clearly obnoxious . . . before it will be
declared invalid by the courts.   Every intendment is to be
indulged in favor of its validity, and all doubts resolved in a
way to uphold the law-making power, and a contrary con-
clusion will never be reached upon like considerations." (*In
re Berry,* 147 Cal. 524, [109 Am. St. Rep. 160, 82 Pac. 44] ;
Dillon on Municipal Corporations, sec. 353.)   In the case of
*In re Smith,* 143 Cal. 368, [77 Pac. 180], the court said: "It
must happen in the case of many of these ordinances, that
the unreasonableness and oppression is not apparent upon the
face thereof.   Evidence in such cases will be admitted to
show existing conditions.   But this evidence will not go to
motive.   If the conditions justify the enactment of the or-
dinance, the motives prompting its enactment are of no conse-
quence.   If the conditions do not justify the enactment, the
inquiry as to motives becomes useless."

We may pause here to observe that the court uses the term
"motive" in an entirely different sense from the sense in
which the legislature used the word "purpose," that is, in
conferring the power to fix a license tax "for the purpose of
regulation."   The word "purpose" means "that which a
person sets before himself as an object to be reached or ac-
complished; the end or aim to which the view is directed in
any plan, manner or execution." (Words and Phrases Judi-
cially Defined.)   "The purpose of legislation is to be deter-
mined by its natural and reasonable effect, and not by what
may be supposed to have been the motives upon which the
legislature acted." (*People* v. *Roberts,* 171 U. S. 658, [19
Sup. Ct. 58].)   The court in the Smith case did not intend to
use the word "motive" synonymously with the word "pur-
pose" as used in the statute, for it said: "Evidence in such
cases will be admitted to show existing conditions," and from
these we are to judge of the purpose which, in the present
case, it is claimed is shown by the evidence to have been for
revenue and not regulation.

But to recur to the particular point under discussion.   It
seems to us that when under the power of the court evidence
is taken, the court must judge of its sufficiency to establish an
issue precisely as in other cases except where the validity of
a statute is in question, the evidence must clearly show the or-

dinance to be unreasonable, and where the evidence leaves the court in doubt, that doubt must be resolved in favor of the validity of the ordinance. For example, slight evidence upon an issue of fact favorable to the validity of the ordinance may be overcome by preponderating evidence to the contrary leaving no reasonable doubt of its reliability and weight. "The general rules of the law of evidence relating to the burden of proof and presumption and the admissibility and sufficiency of evidence are ordinarily applicable in *habeas corpus* proceedings, although they are not so strictly applied as in actions at law or criminal trials." (21 Cyc., pp. 319, 321-323; 15 Am. & Eng. Ency. of Law, p. 197.) What, indeed, would be the use of calling witnesses and taking evidence "to a full and fair examination of the case," as section 1484, Penal Code, provides, if the court is not to determine the sufficiency of the evidence adduced?

6. In the sense in which the term "purpose" is used in the act, evidence is admissible which would tend to show that revenue and not regulation was the object or end to be attained; and also as bearing upon the necessity for and extent and character of the regulation required to be given the business. The court will consider the "circumstances in the light of existing conditions." (*In re Smith*, 143 Cal. 368, [77 Pac. 180].) These conditions are multifarious and indefinable by fixed rules. In *Plumas County* v. *Wheeler*, 149 Cal. 758, [87 Pac. 909], the supreme court said: "We cannot undertake to specify all the particulars which should be brought into view where the reasonableness of a municipal ordinance is challenged." The court there undertakes to enumerate some of the expenses to the municipality which may be shown in addition to such as arise directly in the enforcement of the regulatory provisions themselves. "In fixing the fee, it is proper and reasonable to take into account not the expense merely of direct regulation but of all the incidental consequences of the business licensed. . . . To arrive at the amount of such expense, it would be necessary to consider the topographical condition of the country, the extent of the industry as practiced there, the effect of the industry on the roads, trails and other public property of the county, the probable cost of prosecution for violations of the ordinance and any other matters having a reasonable tendency to indicate the

cost to which the county would be subjected by the business sought to be regulated.'' These are suggested as some of the expenses that may be considered in determining the amount of license tax necessary for the regulation of the business. But there are many other considerations that may be brought into view as tending to show the true purpose and effect of the tax. The conditions in the so-called mountain counties as differing from the conditions in valley counties; the conditions existing in different parts of a county; the sparseness of population and infrequency of roads and highways in the parts of the county where sheep are principally pastured; facts having any reasonable tendency to show the amount of the tax required for regulation of the business; also the effect upon the highways in driving cattle, horses, mules and goats over the highways used as compared with the effect of the use of highways in driving sheep, and this not only as to the livestock grazed and pastured in the county, but the strictly migratory stock passing through the county to and from ranges in other counties and to market, for damage to the highways and the extent thereof by livestock other than sheep would tend to show that all damage to highways and the necessity for regulatory measures relating thereto are not attributable alone to the business of raising and pasturing sheep in the county; evidence is pertinent, also, which tends to show by comparison that the tax for regulation exceeds or nearly equals the tax for revenue if it should appear that there is no necessity or requirement for a tax for regulation approaching the requirements of a tax for revenue; the fact may be shown that the larger number of the sheep the subject of the tax are brought to the county for summer pasture only and for less than half of the year, and that the principal sheep ranges are, because of climatic limitations, incapable of being used for pasturing sheep in the winter season, and that but comparatively few sheep are raised and remain throughout the year in the county; evidence may be considered which tends to show to what extent, if at all, any or all or how many of the regulatory provisions have been or are in fact being enforced or in fact have entailed or are likely to entail cost upon the county and to what extent such cost is reasonably necessary and reasonably attributable to the business of raising, herding and pasturing sheep in the county. In short, facts may

be considered which have a reasonable bearing upon the question whether the tax is unreasonably excessive for the purposes of regulation only, or tend to show that the tax is either purposely imposed for revenue or from its effect it plainly appears to be a revenue measure.

The case of *Postal Telegraph Cable Co. v. Taylor*, 192 U. S. 64, [24 Sup. Ct. 208], involved the reasonableness of an ordinance which imposed an annual license fee of one dollar on each pole and two and one-half dollars on each mile of wire used in the borough. The court said: "We come, then, to an examination of the question whether this fee, in the light of the admitted facts as set forth in the affidavit of defense can, by the widest stretch of the imagination, be regarded as reasonable. The borough is, where the poles are planted and the wires stretched, sparsely settled and the danger to be apprehended from the poles and wires reduced to a minimum. The borough has in fact done nothing in the way of inspection or supervision during the time covered by the license in question. It has not expended one dollar for any such purpose. It has incurred no liability to pay any expense arising from inspection or supervision on its behalf. . . .

"To uphold it in such case as this is to say that it may be passed for one purpose and used for another; passed as a police inspection measure and used for the purpose of raising revenue; that the enactment of a police measure may be used as a subterfuge for the purpose of raising revenue, and yet, because it is said to be an inspective measure, the court must take it as such and hold it valid, although resulting in a rate of taxation which if carried throughout the country, would bankrupt the company were it added to the other taxes properly assessed for revenue and paid by the company. It is thus to be declared legal upon a basis and for the reasons that do not exist in fact. . . . Confessedly there has been here no inspection, no expense incurred to provide for one even though not made, and all expenses and liabilities that might fairly and reasonably be incurred on the part of the borough are not one-twentieth of the amount it exacts for an inspection which it has not made. Under such facts it would seem to be plain that the ordinance was adopted as a means for the raising of revenue and not to repay expenses for inspection. Judging the intention of the borough by its action it did not

intend to expend anything for an inspection of the poles and wires, and did intend to raise revenue under the ordinance. Courts are not to be deceived by the mere phraseology in which the ordinance is couched.''

The supreme court said in *Plumas County* v. *Wheeler,* 149 Cal. 758, [87 Pac. 909] : ''It is also well settled that the power to regulate a business may be exercised by means of a license fee or charge. The amount of the license fee, however, must not be more than is reasonably necessary for the purpose sought—i. e., the regulation of the business. If it is so great that the court can plainly see that the purpose of its imposition was to realize a revenue under the guise of regulating the business, the provisions for the fee cannot stand as an exercise of the police power.''

7. With these principles as our guide let us examine the facts in the case. The county of Lassen may be designated as mountainous, the greater portion of the western part being of high elevation and in the belt of heavy winter snows; is in considerable part timbered and of such climatic conditions as to admit only of summer pasturing and by sheep is generally so used for three to five months of the year, depending upon the seasonal storms. A somewhat similar region is found in a large area of the northern and eastern part of the county, but less timbered, less snow and rain, to some extent a sage-brush country and used for summer and fall pasture of live-stock and some portions so used in the winter. Of valleys more or less cultivated, Honey Lake Valley, elevation about four thousand feet, the lowest in the county, and Big Valley, are the principal ones, with here and there small valleys in the eastern and northern parts of the county. The total area of the county is about three million acres, of which a little over six hundred thousand acres are assessed, and of this only about one hundred thousand acres are assessed as agricultural land. The population is centered in and around these valleys. The western, along most of the northern and in the eastern parts of the county few persons have permanent residence—these are essentially summer grazing regions for stock, mostly driven to them in the spring and taken out in late summer. Except in the more thickly inhabited portions of the county, there are very few public roads, and the topography of the country and the settlements in the county

admit of and require but few principal highways, and some of these are not made use of by sheep-raisers. The public roads, in large part, are over comparatively level stretches of country along the sides of which sheep spread out and feed as they travel, doing very little, if any, injury to the roads. The places which give rise to most complaint of injury are on mountain grades and along graded hillsides, chiefly by causing dirt and rock to slip or roll into the roadway. Like injury to a considerable extent is caused by driving horses, mules, cattle and goats over the same roads, which are pastured in the county but pay no license tax. Similar injury is also caused to the roadways by livestock of all kinds driven through the county to other counties for pasture and in going to market, which pay no license tax. Petitioner's sheep are driven from the Sacramento valley to his own land in Lassen county and are there pastured and on the public lands, as are a large number which are included in the ordinance, also driven to their ranges and remain there until returned again to the valley, using the highways only in going and returning and some not using the highways at all in Lassen county. It is not claimed that the injury to the roads caused by the sheep is in any sense permanent, for they are restored by no great expense by clearing the rocks and debris from the road after the sheep are driven to the ranges and later after they are driven back to the valley.

The evidence is that about two hundred and seventy-five thousand sheep and lambs are grazed and pastured in the county during a portion of the year. The tax collector reported to the board of supervisors, July 9, 1908, that "six sheep owners in Lassen county pay taxes on 12,825 sheep, leaving 254,700 sheep on which no tax for revenue is received unless by license." Respondent stated in his return that "there are at the present time 275,000 sheep and lambs in said county." He states that at the time the ordinance was passed the average annual number did not exceed one hundred and fifty thousand. The evidence of men engaged in the business and familiar with all the facts shows that the number is and has been for several years about two hundred and seventy-five thousand. The number paying property tax is as above stated, which leaves two hundred and sixty-two thousand one hundred and seventy-five of what may be termed

migratory sheep and lambs. It appears from the evidence that some of the sheep which are assessed for taxes in Lassen county are pastured part of the year in that county and some, in order to procure feed, are there taken to Plumas or Modoc county for pasture, for two or three months, in the national forest reservations. These sheep pay a property tax in Lassen county and a license.tax there also, and another license tax in Plumas or Modoc county, and a rental license of eight cents per head to the general government, of which the county now gets twenty-five per cent, one-half of which goes to the road fund. The sheep coming into the county from the Sacramento valley remain from three to five months, and while it is impossible for them to remain after the stormy season begins, they must take out a license for one year, and this applies to ninety-five per cent of the sheep pastured in the county; and in some cases the valley sheep are taken for part of the season from Lassen county to Plumas or Modoc for pasture and are there subject to a second license tax for one year. It appears also that the assessment-roll for the county is something near $6,000,000, from which for the year 1907-08 the taxes yielded to the general fund a little over $25,000 and the road fund nearly $24,000. The license tax imposed upon the business of pasturing sheep, having an assessed value of about one-half a million dollars, amounts to more than one-half the general fund or road fund derived from property tax on more than ten times that assessed value. Sheep, not including lambs, which are not assessed in Lassen county or elsewhere, were valued for state and county purposes for the year 1907-08 at $2.50 per head and the rate was $1.80 on each $100, or four and one-half cents per head of sheep, excluding lambs, which the evidence shows are about one-third of the flocks. The license tax, which may be imposed for regulation only, is more than the tax for revenue purposes on sheep and is imposed upon lambs which are not assessed. Excluding lambs as not assessable for state and county purposes and treating them as sheep, the license tax is five cents per head as against three cents for state and county revenue. The principal expense to the county alleged to be caused by this business is for work done on the public roads. The limit of taxes for road purposes is forty cents upon each $100, and Lassen county levied up to this limit.

This tax for that purpose would be one cent per head upon sheep and on the number subject to license tax would yield $2,750, whereas the license tax amounts to $13,750. It appeared also that the general road fund is reinforced to some extent from the share of the government rentals paid for grazing of stock on national reservations, of which there are over half a million acres in Lassen county. Numerous license ordinances adopted by the county are not without significance as tending to show the object and purpose of these measures. January 9, 1900, the license tax was fixed by Ordinance No. 51 at three cents per head of sheep, lambs and goats. It contained no regulatory provisions. On April 7, 1900, a similar ordinance, No. 52, fixed the license at five cents for each sheep, lamb or goat. These ordinances were passed when the board had power to license for revenue and were passed for that purpose. On January 7, 1903, after the law was passed limiting the power to license for regulation only (Stats. 1901, p. 635—Pol. Code, sec. 3366) Ordinance No. 64 was adopted. In its title it purported to be for regulating the business of raising, grazing, herding or pasturing sheep, lambs or goats within the county and imposed a license tax of ten cents per head of each sheep, lamb or goat, but the ordinance did not contain a single regulatory provision. On March 5, 1903, two months later, after the legislature had passed the act of February 26, 1903, limiting the license tax to five cents per head "on the business of raising, grazing, herding or pasturing sheep," Ordinance No. 67 was adopted reducing the license to five cents per head, but the ordinance contained no regulatory provisions whatever. The evidence is that conditions in Lassen county then were the same substantially as now and for years previous and the business was conducted as now. There can be no doubt but that these ordinances were adopted for the purpose of swelling the county revenues and can be given no other interpretation. Ordinance 69 followed along March 10, 1904, and was similar to ordinance 67, but contained in addition some regulatory provisions. No change in existing conditions occurred in the meantime, and so far as the regulatory provisions are concerned the evidence is that no pretense was made of enforcing any of them. Then came ordinance No. 82, January 11, 1908, in question here, which includes sheep and lambs and con-

tains a large number of regulatory provisions. But the evidence discloses no material changes in the conditions in Lassen county relating to the business in all these years, except it may be that the number of sheep grazed in the county has increased to some slight extent. The area of grazing land has not changed nor has the manner of conducting the business. Conditions have not changed and nothing appears to show that for regulation alone the charge should be as great as when the tax was laid for revenue. The simple truth is, as appears from the evidence, that the ordinances have changed in name, but the purpose remains the same—i. e., to obtain revenue.

In *Plumas County* v. *Wheeler,* 149 Cal. 758, [87 Pac. 909], the court said: "The amount of the license fee must not be more than reasonably necessary for the purpose sought—i. e., the regulation of the business." How wide a scope must be given to the term "regulation"? How are we to determine where the purpose to regulate ceases and the purpose to obtain revenue begins? In the exercise of the police power of the board, under which alone the ordinance may be passed, to what extent may the board go in the direction of exacting the payment of money, for the privilege of engaging in a useful and harmless business? Clearly no further than is necessary to regulate the business. What do we mean by regulate? To regulate means to adjust by rule, method, or established mode; to direct by rule or restriction; to subject to governing principles of law. It does not include a power to suppress or prohibit (24 Am. & Eng. Ency. of Law, pp. 234, 235). The elements which enter into the charge are the necessary or probable expense incident to the issuing of the license and the probable expense of such inspection, regulation and police surveillance as municipal authorities may lawfully give to the particular business; the expenses attending direct regulation and oversight and the incidental cost to which the municipality is subjected in properly supervising the business (*Plumas County* v. *Wheeler,* 149 Cal. 758, [87 Pac. 909]); the municipality may impose under the police power such charge for the license as will cover the expense of issuing it, and the additional labor of officers and other expenses incurred (Cooley's Constitutional Limitations, ed. 1886, p. 242); if all the items of expense reasonably necessary for the

proper supervision and control of the business would amount to less than five cents per sheep or lamb the ordinance cannot be sustained (*Plumas County* v. *Wheeler,* 149 Cal. 758, [87 Pac. 909]). "A police regulation or restraint is for the purpose of preventing damage to the public or to third persons." (*City of Sonora* v. *Curtin,* 137 Cal. 583, [70 Pac. 674].) Witness Sharp, called for respondent, submitted what is entitled an "Estimate of the Auditor of the probable annual cost and expense of regulating the sheep business," as follows:

| | |
|---|---:|
| License collector's commissions | $   850.00 |
| Printing licenses, affidavits, etc | 50.00 |
| Expense of enforcing section 2 of ordinance No. 82 | 1,000.00 |
| Expense of criminal prosecution for violation of the ordinance | 1,200.00 |
| Damage to public roads | 10,000.00 |
| | $13,100.00 |

This estimate, the witness testified, was made at the request of the board "for the purpose of the hearing of this case"; not by the board as a basis for its ordinance previously passed. The bills presented in support of the estimate for printing licenses amounted to less than $20. In further support of the item, a bill was presented for publishing the ordinances, $60, which certainly was not pertinent.

The ordinance makes no provision for payment of commissions to the license tax collector, set down at $850. The tax collector receives a salary and is allowed a deputy at a stated salary (Stats. 1907, p. 536), and by section 4126, page 391, it is made his duty to "collect all county licenses." The district attorney and sheriff are also paid salaries, and the statute (sec. 4290, p. 545) provides that "the salaries and fees provided in this title shall be in full compensation for all services and fees of every kind and description rendered by the officers named in this title, either as officers or *ex-officio* officers, their deputies and assistants, unless otherwise provided, and all deputies employed shall be paid by their principals out of the salaries provided in this title, unless in this title otherwise provided."

The item of $1,000 is for enforcing section 2 of the ordinance. This section requires the person raising or pasturing sheep in the county to make an affidavit setting forth certain facts; it does not impose any duty on any officer to enforce this requirement. We must look to other sections for that. There is no expense to the county in the act of the sheep-raiser making the affidavit except the trifling cost of the affidavit. Section 3, however, empowers the tax collector, whenever he deems it expedient and "in such manner as he may deem best," to verify the statements in the affidavit and "to ascertain the true facts with relation thereto," and if he finds that any false statement has been made to report the same to the district attorney, and the cost of such examination is made "a county charge to be allowed as other claims against the county." It is contended by petitioner that this requirement of the tax collector falls within his ordinary and statutory duties, and cannot be made a county charge to be assessed against this business and covered by the license tax. There is much force in this contention. The bills presented by the tax collector's deputies, appointed to secure affidavits from sheep-raisers are, however, so inconsiderable a sum, as shown by the evidence, that we may dismiss the estimated item as unsupported. The evidence is that there has never been any attempt at supervision or inspection of the business and no expense incurred in that direction at any time since this or any of the ordinances have been in force. The dipping and doctoring of sheep have been attended to by inspectors appointed under state and national law, and the evidence is that the sheep generally throughout the county have been free from scab—the prevailing trouble among sheep-raisers. The interest of the flock-master compels him to look to this with vigilance.

The item of $1,200 for expense of criminal prosecutions for violations of the ordinance is largely conjectural. Presumptively, civil actions, if successful, will pay their cost by the fines collected, and if unsuccessful it should not be fastened on the business regulated. The district attorney and peace officers charged with the duty of enforcing the ordinance are entitled to no compensation for such service except that provided by law. The district attorney may incur certain liabilities in the preparation and prosecution of cases which

become a county charge under section 22 of the County Government Act (Stats. 1897, p. 595), not, however, relied on here, but it is not reasonable to suppose, and past experience of the county so shows, that any such sum as $1,200 annually, legally chargeable to the business, will be incurred in prosecuting violations of the ordinance. The evidence is that under ordinance number 69, three civil actions and nine criminal actions were commenced in 1907. All these were dismissed by the district attorney as settled, except one in which a fine of $200 was imposed and collected. Two cases were commenced in 1908 under ordinance number 82, a civil and criminal action against petitioner. The district attorney testified that he had actions in contemplation under some of the regulatory provisions relating to dead sheep being left in or near a highway. Such prosecutions, it is claimed, must be made either under section 2737, Political Code, or section 374, Penal Code, and not under this ordinance. (*Ex parte Stephen,* 114 Cal. 278, [46 Pac. 86].) But conceding that the foregoing items relate to legitimate expenses which may reasonably arise out of the regulation of the business, the evidence shows that the expenses thus incurred amount to but a small part of the total collections sought to be made by the ordinance for regulation. The principal item is $10,000 for "damages to public roads." It is contended by petitioner that "there is a vast difference between the regulation of a business, and the taxing of such business for some alleged damage caused by it. The one seems to be within the police power, and the other is within the taxing and revenue power." All the definitions of the term "regulate" restrict its meaning to providing a rule for conducting the business to be regulated, to inspection and police surveillance, supervision and oversight, and the license fee must have relation to expenses incurred for these purposes. It may not be gauged upon an estimate of consequences or damages which may result from the business. These may be considered as suggesting the necessity for regulatory provisions, but not as a basis for some direct or remote damage that may accrue to the state or county, nor for the support of the government, which are to be met by licenses for revenue, forbidden in the present case. The use of the public roads is not to be denied the men engaged in the sheep industry; they have the same right to

their use as other citizens. If through their use by the sheep-men some detriment different from or greater to the roadways occurs, such use may be regulated, and the expense of any necessary and reasonable regulatory measures may be made part of the license fee charged and the ordinance contains provisions to this end. But to fix a license charge to meet repairs on roads generally throughout the county, which must be paid by all who engage in the business regardless of whether all of them contributed to the injury and regardless of damage done by other livestock, would be unreasonable. The evidence is that many sheep are brought into and taken out of the county without any appreciable damage to the roads; many sheep are taken to the western part of the county that never pass over the roads farther east, and over but short distances anywhere, and so of many sheep entering the east-ern and other parts of the county—they traverse few miles of roads and on some roads not at all. The regulatory pro-visions are designed to obviate much of the alleged damage and if enforced might to some extent do so, but no attempt has ever been made to enforce them, the county apparently endeavoring to recoup the damage by license tax. There is much evidence upon this feature of the case. Naturally, the sheep-raiser minimizes the damage to roads by sheep and prob-ably exaggerates the damage done by other livestock. On the other hand, the same may be said of witnesses who testify to the greater damage by sheep—they exaggerate that and mini-mize the other damage. All concede some damage by all kinds of livestock when driven over the roads in certain places. But it may be safely said of the sheep that it is only on mountain and side-hill grades that they do appreciable damage, and this the evidence shows is repaired at no consid-erable cost by simply throwing the rocks out of the road, and these grades constitute but a small fraction of the entire high-ways. And the evidence, as shown by the road commissioners' reports for the past three years, is that the expenditures were largely for bridges and general repairs in no wise made neces-sary by the use of the roads by sheep.

It is contended that many of the regulatory provisions are unlawfully discriminating against those engaged in the said business. The evidence is that a great many sheep, as well as other livestock, pass through the county over its roads to

other counties for pasturage and to market, to which these provisions of the ordinance do not apply. It is claimed also that while the county cannot impose a license tax upon such sheep (*County of Mono v. Flanigan,* 130 Cal. 105, [62 Pac. 293]), the county can, and should, if regulating the business at all, make such sheep and livestock subject to the regulatory provisions of the ordinance. The tax collector, in a report to the supervisors, July 9, 1908, said: "There are continually coming into and pasturing through the county from different directions, numerous large bands of sheep not herein accounted for. In passing and repassing, these migratory sheep destroy feed and roads and molest waters to an extent that can hardly be estimated." The regulatory sections which are not made applicable to this class of sheep, and they seem to call for regulation if any do, are: Section VII, relating to leaving the dead body of a sheep near a public road; section XI, making it a duty to avoid injury to the highways; section XII, making it unlawful to drive more than one hundred sheep upon a bridge; section XIII, restricting the right to peddle tainted meat; section XIV, making it unlawful to herd or drive sheep along the streets of a village; section XV, making it unlawful to expose the poisoned carcass of a sheep; section XVI, making it unlawful to herd any band of sheep about water ditches and reservoirs; section XVII, prescribing the manner in which sheep shall be herded in traveling along the roads and trails. Substantially all of the important regulatory provisions are brought under the ban of this objection. Shorn of its regulatory features, nothing would remain but a revenue measure, and being such would be void.

Finally, it is contended that the license tax upon lambs is burdensome, oppressive and unreasonable and is violative of the act of February 26, 1903, *supra.* The evidence is that about one-third of the flocks are lambs, born in March and April. This is especially true of petitioner's sheep and substantially all, for but few sheep are raised in Lassen county. These nursing lambs are but two or three months old when taken to the ranges, and leave when six or seven months old. They are not taxed for state and county purposes, and are not treated as sheep by the national foresters. It appeared by the evidence that in buying and selling sheep, and in transactions relating to the business, lambs are not known as sheep,

*eo nomine,* and are not dealt with as sheep before they are a year old and are then spoken of as "yearlings." The ordinance itself admits the distinction by naming sheep and lambs separately, which would be unnecessary if lambs are regarded as sheep. The act of February 26, 1903, mentions sheep only, and it is not improbable that the legislature had this distinction in mind. The act limits the charge upon the business of raising, herding, grazing and pasturing sheep. It is contended, and it so appeared, that the business of raising sheep consists in raising lambs and producing wool; that raising lambs is a considerable part of the business of raising sheep, to which the act refers; that without taxing lambs the extreme limit, allowed by the act, is imposed upon this business, and that in taxing lambs the ordinance goes beyond the prescribed limit of power.

It is furthermore contended that if there be doubt as to whether the legislature meant to include lambs in the act, the lamb should have the benefit of the doubt because of its tender age and much less value, and because it would be unreasonable to treat it for purposes of licensing or taxation the same as an old sheep. In interpreting the meaning of the word, with reference to taxation for state and county purposes, it is universally interpreted to exclude unweaned lambs just as the young of other animals are excluded. The statute provides that words "are construed according to the context and the approved usage of the language." (Civ. Code, sec. 13.) "In construing statutes, words are to be taken in their usual and popular sense, unless they have a well understood technical meaning." (*Houghton's Appeal,* 42 Cal. 35.) We do not find it necessary to decide the point. We think it otherwise plainly appears that the ordinance is unreasonable, and was adopted for the purpose of raising revenue and was not intended to be, and is not, an ordinance adopted for regulation only, and is therefore void.

It is ordered that the petitioner be discharged.

Hart, J., and Burnett, J., concurred.